# Exhibit D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION-RIVERSIDE

HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )
                               )
v.                             ) DOCKET NO. EDCR 03-84(A) VAP
                               )
RODRICK REED,                  )
                               )
               Defendant.      )
_____)

REPORTER'S TRANSCRIPT OF SENTENCING PROCEEDINGS
Riverside, California
Tuesday, January 17, 2006

PHYLLIS A. PRESTON, CSR
License No. 8701
Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501

COPY

1                                  <u>APPEARANCES</u>

2

   For the Plaintiff:        OFFICE OF THE UNITED STATES ATTORNEY

3                                  By:  <u>TIM SEARIGHT</u> &
                                        <u>CHRISTOPHER BRUNWIN</u>

4                                  Assistant United States Attorneys
                                   1200 U.S. Courthouse

5                                  312 N. Spring Street
                                   Los Angeles, California 90012

6

7    For Defendant Reed:          <u>JOSEPH VODNOY</u>
                                   Attorney at Law

8                                  Los Angeles Law Building
                                   316 West Second Street, Suite 1200

9                                  Los Angeles, California 90012

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              TUESDAY, JANUARY 17, 2006, RIVERSIDE, CALIFORNIA
 2                              ---o0o---
 3              THE CLERK:  Calling Item No. 1, EDCR 03-84(A) VAP,
 4    United States of America versus Rodrick Cardale Reed.
 5              Counsel, appearances, please.
 6              MR. SEARIGHT:  Tim Searight and Christopher Brunwin
 7    on behalf of the Government.
 8              THE COURT:  Good morning.
 9              MR. VODNOY:  Good morning, Your Honor.  Joseph
10    Vodnoy on behalf of Mr. Reed who is present in custody.
11              THE COURT:  This matter is set on the Court's
12    calendar for sentencing.  Are both sides ready to proceed
13    with sentencing?
14              MR. SEARIGHT:  Yes, Your Honor.
15              THE COURT:  Both sides ready to proceed with
16    sentencing?
17              MR. VODNOY:  Your Honor, we received, as I pointed
18    out in my reply, materials about Agent Starkey's
19    investigation that occurred in October, and immediately I
20    sent an investigator to try and investigate.  If that's going
21    to play any part whatsoever in the Court's determination as
22    to what the sentence should be, I would respectfully ask for
23    a continuance in order to complete the investigation.  We did
24    as much as we could as fast as we could, and we were unable
25    to locate the particular marshal that we were looking for or
```

marshals.  I don't know what they are going to say but it
seems to me that just taking the word of Shane Williams as
something that should impact his sentence I think would be
improper without allowing us an opportunity to investigate
those charges.

That seems to be the gravamen of the brief by the
Government.  And as I said, we were here in December and no
notice of any kind was given to me regarding the October --
and this thing occurred in October, so you had all of
November and December to notify me.  If they had notified me
in December, obviously, I would have had a month or more.

THE COURT:  Well, I think it is important.  I don't
know that it is critical for my sentence; that is, if you
took that information away I don't know that my tentative
sentence would be different, but I would grant you a
continuance if you wish to look into it.

MR. VODNOY:  Yes, I certainly would like to because
that may --

THE COURT:  Let me hear what the Government has to
say before I make a decision.

MR. SEARIGHT:  I would not characterize it as the
gravamen of the Government's sentencing position.  It is
certainly an important factor, but I would hope the Court
would base its sentence upon the crimes of conviction and the
background of the defendant.  It is a factor.  I don't

1    strongly object to a continuance; however, I believe that we

2    should proceed today.  I believe the presentence report can

3    be relied upon hearsay and it is appropriate to proceed.

4              THE COURT:  Well, I think we should proceed today.

5    I suppose I would be inclined if we proceeded today to be on

6    the safe side and not consider that incident.  I think it

7    probably doesn't -- to do so would not change my tentative

8    ruling, but to be fair to the defense and, too, I think the

9    Government could have informed you a bit earlier.  They did

10   not do so.  I will treat this as an objection to -- or treat

11   your last filing on Friday as an objection to the Court

12   considering that and I will sustain it.

13             MR. VODNOY:  All right, Your Honor.  Then I'm

14   prepared to proceed.

15             THE COURT:  The presentence report was filed on

16   November the 9th.  Have you reviewed the presentence report

17   with your client?

18             MR. VODNOY:  Yes, Your Honor.

19             THE COURT:  Mr. Reed, good morning.

20             DEFENDANT REED:  Good morning, Your Honor.

21             THE COURT:  Have you seen the probation officer's

22   report in your case?

23             DEFENDANT REED:  Yes, I have.

24             THE COURT:  And you have reviewed it with your

25   lawyer?

 1          DEFENDANT REED:  Yes, I have.

 2          THE COURT:  In addition to the presentence report

 3   the Court has reviewed the following:  The Government's

 4   position paper filed on January the 3rd, the defendant's

 5   position or sentencing memorandum filed on December the 22nd

 6   and a supplemental one filed on January the 13th.  In

 7   addition, numerous letters have been submitted on behalf of

 8   the defendant.  And I don't recall -- I think they were

 9   attached to the December 22nd filing.  They may have been

10   separately submitted, but there were numerous letters from

11   members of the defendant's family and others.

12          Is this everything that both sides have filed?

13          MR. SEARIGHT:  Yes, Your Honor.

14          MR. VODNOY:  Yes.

15          THE COURT:  All right.  There were no objections to

16   any factual matters set forth in the presentence report.  The

17   only objection, as stated just a moment ago, is to the

18   Court's consideration regarding an incident between the

19   defendant and Mr. Shane Williams and I've sustained the

20   objection.  I wouldn't consider that.

21          My tentative ruling after consulting the guidelines

22   and considering them as advisory in determining a reasonable

23   sentence in this case is to sentence the defendant to a term

24   of life imprisonment.  The offense level in this case is

25   calculated at 44 based on a base offense level of 38, plus

1   with an upward adjustment of 2 levels because of the

2   possession of a dangerous weapon and further upward

3   adjustment of 4 levels as the defendant was the leader of

4   this conspiracy which results in a total offense level of 44.

5           The defendant's criminal history category is 2.

6   The defendant requests a sentence of less than life, argues

7   essentially an argument of sentencing entrapment; that is,

8   that the agents could have arrested him much earlier in the

9   case before so much PCP was manufactured.  And, of course,

10   the amount of PCP is what drives the offense level; however,

11   there is no showing that the defendant here lacked the intent

12   to produce the amount of drugs at issue, nor that he lacked

13   the capacity to do so.  Those are the two things that a

14   defendant making an argument of sentencing entrapment has the

15   burden of showing.  I cannot find that the defendant here has

16   satisfied a showing of either of those two crimes.

                            Gov't.?

17           The defendant requests that the defendant receive a

18   sentence of life.

19           Looking to the factors set forth under 18 United

20   States Code, Section 3553(a), starting with the nature and

21   circumstances of the offense, this is a far flung conspiracy

22   and Mr. Reed personally recruited I think nearly all of the

23   defendants, many whose lives have been ruined or

24   substantially damaged by this.  And, of course, there are

25   many others that the Court doesn't know about whose lives

1   have been ruined by the use of PCP.

2          The history and characteristics of the defendant.

3   Mr. Reed was raised -- his parents may not have done by him

4   as they should have, as they abandoned him pretty young.  He

5   was raised by grandparents in a stable home.  And, of course,

6   many of the letters, many, many of the letters that were sent

7   on his behalf talked about how well he was raised by his

8   grandparents and how Mr. Reed and his siblings were taken to

9   church and given everything they needed.  They had a far

10  better home life -- early home life than many of his

11  co-defendants.  And it's hard to see how the -- to say it

12  another way, the defendant's own letter to the Court stresses

13  what he describes as his desire to continue to bring up his

14  children as law abiding and church going citizens.  And it's

15  hard for the Court to give that much credence in light of his

16  own activities in this case.

17          A need for the sentence to reflect the seriousness

18  of this offense, to promote respect for the law and to

19  provide just punishment, as the Government points out, the

20  amount of drugs involved in this case is many, many times the

21  amount that would merit a life sentence under the guidelines.

22  So it is hard to think of a sentence that would better meet

23  that factor in terms of seriousness.  And, of course, that is

24  only one half of the conduct here, because the other part of

25  the case, as the Government argued at trial, is the firearms,

1    and in particular the silencers and the AK-47.  Those are not

2    -- there is only one purpose for an AK-47 the Government

3    argues and there is certainly only one purpose for silencers.

4          The need to afford adequate deterrence to criminal

5    conduct, it is difficult to determine what would deter this

6    defendant from future criminal conduct.  And, for example,

7    the continued manufacture of PCP even after the seizure of

8    the van in the middle of this investigation really shows that

9    the defendant wasn't -- well, subject to much deterrence.

10          The need to protect the public from further crimes

11    of the defendant, the violence of the defendant is shown, as

12    I said a moment ago, by the silencers in this case, the

13    threats that were captured on the wiretap conversation, and

14    of course, the dangerous nature of the drug that was being

15    manufactured, the dangerous nature of the manufacturing

16    process and the dangerous nature of the drug as it is

17    consumed by others.  All of that shows the importance of that

18    factor.

19          And finally, the need to avoid undue disparity with

20    similarly situated defendants, there were a number of

21    defendants in this case, and many of them have received

22    sentences in a wide range of sentences.  They come from very

23    different backgrounds from the defendant and they have spent

24    their lives very differently than Mr. Reed has chosen to

25    spend his.  Many of them have been really productive members

```
 1    of society.  They have stayed out of the court system until
 2    they had the bad luck to get either recruited into this by
 3    Mr. Reed or have the drugs planted in a lawn mower in their
 4    garage by Mr. Reed or just had been down on their luck at a
 5    time when they were recruited into this.  And they all bear
 6    responsibility for their own actions, but their sentences
 7    have to reflect that.  And the sentence of someone who is the
 8    leader of this conspiracy and who has the responsibility for
 9    so much damage and destruction has to receive a sentence that
10    reflects that.  As I said, my tentative ruling is to impose a
11    sentence of life.
12              Do you wish to be heard?
13              MR. VODNOY:  Yes, Your Honor.  Thank you.
14              First of all, with respect to the drugs themselves,
15    it is our opinion that the quantity was exaggerated during
16    the trial.  I did object at that time to the experts taking
17    what was a smaller amount and making it into a larger amount.
18              I also objected with respect to Shane Williams who
19    buried his own product in the desert and then -- and was, in
20    fact, contradicted by his family.  Although the jury did not
21    hear it, Your Honor did hear that.
22              THE COURT:  I did.  I did not find your attack on
23    Mr. Williams' credibility to be persuasive.  You've said --
24    well, I'm going to leave aside this recent incident because I
25    have sustained your objections to it so we won't go into
```

1   that.  But a small part -- well, some part of your sentencing

2   argument has been based on an attack on the credibility of

3   some of the witnesses who testified and I just have to say

4   for the record, well, both as to Mr. Williams and

5   Mr. Stinson, that I found both of them to be unusual

6   cooperating witnesses.

7          MR. VODNOY:  Well, of course, I would disagree,

8   particularly in view of the fact that we had his sister and

9   his family; that is, Mr. Shane Williams' family stating that

10  he had --

11         THE COURT:  You did not.  You had triple or

12  quadruple hearsay.

13         MR. VODNOY:  Exactly.  That's why you didn't --

14         THE COURT:  It's not only that it wasn't

15  admissible, but the reason it's not admissible is because

16  it's not reliable.  So had -- you presented the Court with

17  something that was inherently unreliable and now you're

18  arguing as though those persons came into court and said the

19  things that you're arguing which is not the case.

20         MR. VODNOY:  That is true.  I simply point out that

21  Your Honor had the benefit of those reports that I brought to

22  the Court's attention.

23         THE COURT:  Which were triple or quadruple hearsay.

24         MR. VODNOY:  They may have been, but they were

25  Shane Williams' family members, and although the jury didn't

1    hear and Your Honor did, now we are at the sentencing, so it
2    is, in effect, like a court trial, in effect, so that you did
3    have the information.

4          THE COURT:  I would not admit it at a court trial
5    because it is inherently unreliable.

6          MR. VODNOY:  For whatever that point is worth,
7    which is nothing, I want to make it anyway because I want to
8    try to cover the bases.

9          With respect to the violence that seems to be a
10   factor, I would point out that actions speak louder than
11   words.  Throughout this entire investigation that went on for
12   years apparently, according to Detective Labbe, not one
13   person can be said to have been injured, assaulted, killed,
14   attempted to be killed, anything.  So we're talking about --
15   what kind of actions are we talking about?  There is none.
16   There's no actions.  Otherwise, he would be sitting in court
17   somewhere with some kind of a violent crime being charged
18   against him.  None was ever done.

19         And I would have to say that in terms of the
20   surveillance and the wiretaps, and they looked at him in a
21   microscope, all we got was conversations.  And as I pointed
22   out in my reply brief, when you have white men translating
23   black slang you get the wrong answer.  I mean, I'm going to
24   hit you tomorrow.  Now, that may mean if I say it that I'm
25   going to do something to you or I'm going to kill you or I'm

1  going to hit you or do something, but it was obvious from the

2  context in which that was mentioned that hit him yesterday

3  meant he was going to see him tomorrow.  So, obviously, he

4  didn't hit anybody.  He talked to them on the phone.

5          Now, I'm not an expert on black slang but neither

6  is the Government as well, and to suggest that this is a

7  dangerous guy because he's talking about hitting people when

8  it is just a slang expression for talking to them, I find

9  that --

10         THE COURT:  But how do you get around the silencers?

11         MR. VODNOY:  Well, the silencers were at somebody's

12  apartment.  They were not used in any way.  I mean, the fact

13  that --

14         THE COURT:  Are you suggesting your client

15  collected them?

16         MR. VODNOY:  Could be.

17         THE COURT:  Could be.

18         MR. VODNOY:  The bottom line was that they were

19  never used.  He never took them out and put them --

20         THE COURT:  It is illegal, as you know.

21         MR. VODNOY:  No question.

22         THE COURT:  Well --

23         MR. VODNOY:  You know, possession of guns -- even

24  with possession of guns it's not a crime of violence.  Using

25  a gun is a crime of violence.  Threatening somebody with a

1    gun is a crime of violence. Possessing a weapon in somebody

2    else's place that apparently was so high up that he couldn't

3    reach it, to me, is not a crime of violence.

4         Now, of course, he was convicted of the

5    possession. I mean, the probation officer was aware of all

6    of these things. My client was facing a mandatory minimum of

7    20. The probation officer on pages 3 and 4 of the probation

8    report talks about the various factors that Your Honor set

9    forth regarding the 18 USC 3553(a) and concluded -- and this

10   is, from what I understand, not some completely hard liberal

11   probation officer, concluded that 25 years, which is my idea

12   of a lifetime.

13        THE COURT: The probation officer's recommendation,

14   it's irrelevant.

15        MR. VODNOY: It's not irrelevant. I think it's --

16   whatever you say is what's relevant, per se, but, I mean, in

17   terms of relevancy they're making a recommendation to the

18   Court. And some courts follow the recommendation of the

19   probation department and some don't, but certainly it is

20   relevant.

21        THE COURT: I misspoke. You're right. It is not

22   irrelevant, but if there's anything in the probation report

23   that you object to -- there wasn't.

24        MR. VODNOY: No.

25        THE COURT: You made no objections to anything in

1   the probation report.

2            MR. VODNOY:  Right.

3            THE COURT:  They have a recommendation.

4            MR. VODNOY:  Right.  That's either persuasive or

5   non-persuasive.  When you say it's irrelevant, I have a

6   little problem with that.  It seems to me that he has a

7   function to perform.

8            THE COURT:  I misspoke and I shouldn't have said

9   irrelevant.  It is up to the Court to decide what the

10  sentence is.

11           MR. VODNOY:  Of course, of course.

12           THE COURT:  To argue that I should just accept the

13  probation office's recommendation is not persuasive.

14           MR. VODNOY:  Well, that's true.  Obviously, not

15  persuasive, but I simply point out that someone who is a

16  neutral person -- I mean, obviously, what I have to say in

17  terms of what I think he should get has a bias and prejudice

18  because I am his lawyer and I want him to get the least

19  amount of time possible.  On the other side, the Government

20  is asking for the most time possible and somewhere in the

21  middle is the probation officer.  And that's why I felt that

22  it was important to state on the record, as you well know,

23  that this probation officer after analyzing the various

24  things under 3553 determined that a 25-year sentence was

25  sufficient.

1    Somebody said to me -- of course, I'm an oldie, but
2  if somebody had said to me when I was 38 that I was going to
3  spend 25 years anywhere in prison, I certainly wouldn't
4  consider that a gift.  I would consider that, you know, in
5  effect, a lifetime.  And it seems to me that you can make the
6  point with 25 years, which is hardly, hardly a light sentence
7  by anybody's standards, the same way you can say, well,
8  there's no hope for you.  You will never see your children
9  again.  You will never get out.

10    Nobody got killed.  Nobody got shot, you know, and
11  if half of this is the quantity and half of this is the
12  violence, there is no violence.  There is possession of guns
13  with silencers.  He got convicted of that.  But that's not a
14  crime of violence.  And I really was offended by this whole
15  business about the violence because there was not.  And then
16  when I looked at the transcript, because we're talking about
17  hit people, oh, my God, he is planning a murder, I hit him
18  yesterday and I will see him tomorrow.  That's the kind of
19  thing that you shouldn't --

20    THE COURT:  You didn't make an objection, but I
21  will consider that as an objection to that interpretation.

22    MR. VODNOY:  I certainly do.

23    THE COURT:  All right.  It doesn't really change --
24  well, let me hear from the Government.  I think there are
25  plenty of other threats that were made that were explicit in

1    these transcripts.

2              Mr. Searight or Mr. Brunwin, do you wish to be

3    heard?

4              MR. SEARIGHT:  Is Mr. Vodnoy finished at this

5    point?

6              THE COURT:  Well, why don't you go ahead and

7    address that issue.

8              MR. SEARIGHT:  Okay.  With regard to the telephone

9    calls, if you look at that transcript he attached, I don't

10   see that it's talking about hit me back on the telephone.

11   The language, in fact, is very different from that.  It

12   states, you know, they going to hit hard.  That doesn't mean

13   hit me back on the telephone.

14             THE COURT:  As I -- well, go ahead.  I recall it a

15   little differently.  I recall that during the trial when this

16   was discussed, when that was played and discussed, I believe

17   that it was interpreted by the witness on the stand and a

18   couple of other witnesses who testified that they were

19   talking about the competition in the drug selling business,

20   were going to increase their efforts to gain a share of the

21   market.

22             MR. SEARIGHT:  That may be, although I'm not sure

23   --

24             THE COURT:  Well, Detective Labbe is nodding.  Is

25   this coming back to you?

1        MR. LABBE:  I would have to -- I think the call

2    that I was talking about is between Williams and Reed.  I

3    think that's the call.  I would tend to agree with the Court,

4    if that was the call.

5        THE COURT:  I think that was the context.

6        MR. SEARIGHT:  That may be.  I'm not sure this

7    particular call was actually played during the trial, the one

8    that he's appended to the sentencing report, although I could

9    show it to Detective Labbe.  We didn't just outline that

10    particular call.  There were several.  There was one to

11    Ms. Brooks.  You might initially think, oh, he's just angry.

12    Then he immediately gets on the phone to one of his friends

13    and says the very same thing.

14        So, again, I persist in believing that he is

15    extremely violent.  You cannot get away from those silencers.

16    You cannot make a claim that the silencers are there for

17    self-defense.  If you're engaging in self-defense, why would

18    you need silencers on guns?  All you can draw a conclusion

19    from is he had not one of those, but two of those with the

20    intention in his mind that he would use them to kill other

21    human beings.  That is the only conclusion you can draw.

22        MR. VODNOY:  Your Honor.

23        THE COURT:  Mr. Vodnoy.

24        MR. VODNOY:  With respect to this hit business, and

25    years ago when I was representing exclusively black clients,

1   I would have done a much better job in translating slang, but
2   it talks about the fact you're going to talk to him. Yeah, I
3   hit him yesterday, the other day, so I'm going to get with
4   him.  What could be clearer? And you don't have to be black
5   to understand.

6          THE COURT:  Well, what about the threats on Traniel
7   Brooks?

8          MR. VODNOY:  You know, he's a small man physically
9   and talk is cheap.  I mean, as I pointed out in a sort of
10  legal way in a sense, that he may talk the talk, but he
11  doesn't walk the walk.  And what that means -- I'm sure Your
12  Honor has heard that expression -- is that in reality after
13  you get -- when the dust clears, nobody got hurt ever and
14  that's the point.  You know, they make a big issue about the
15  silencers but it never was used.  I can understand a life
16  sentence if some people got shot and buried and killed and
17  assaulted, you know, this kind of thing.  Then you can say,
18  yeah, this guy is so violent that he's got to be put away
19  because he's never going to change.  But, I mean, to rest
20  half on the quantity of the drugs and half on violence, 25
21  years is enough for the drugs.

22         THE COURT:  I don't recall saying that that's what
23  I was doing.

24         MR. VODNOY:  I mean that was the Government's
25  position that -- it seems to me 25 years is more than enough

1   to cover the drugs.  So if you're left with the difference

2   being you're going to go past the 25 into life without parole

3   and never get out, that has to be the violence aspect, in my

4   analysis in any event.  And there is no violence.  That's the

5   bottom line.  There is talk, there's threats, but talk is

6   cheap and it was never followed through.

7          And as I point out, this is not a situation where

8   they lost him for months on end and God knows what happened

9   during the time that they didn't -- they were on him every

10  day.  We have thousands of tapes and talking every day and

11  they were following him and they had surveillance and this

12  and that, and nothing was ever shown.  And it really bothers

13  me that, you know -- I don't know if I could pass -- not that

14  I'm running around killing anybody, but, you know, somebody

15  listening to all my calls and surveilling me everywhere I

16  go.  I mean, most of us, you know, would do something wrong

17  that -- besides the drugs -- if that was our nature.  If it

18  was my nature to be a violent person, I would be having

19  confrontations.  I would be having things.  You've got NFL

20  players involved with shootings and this and that and here he

21  is, he's talking, talking, talking, but nobody is getting

22  hurt.

23          Now, I understand Your Honor says people are

24  getting hurt by the drugs and I understand that, but that's

25  what 25 years is for.  But to add the additional life, you

1  know, without parole because he is a violent person, because

2  he's got some silencers in somebody else's house that were

3  never used against anybody, that I think is wrong.  I will

4  submit it, Your Honor.

5          THE COURT:  Mr. Searight.  Mr. Searight and then I

6  will --

7          MR. SEARIGHT:  I actually want to go in a slightly

8  different direction.  I disagree with what Mr. Vodnoy has

9  said focusing only upon the drugs that a 25-year sentence is

10  appropriate.  Focusing on the drugs I believe that a life

11  sentence is appropriate.  And, of course, under 3553(a)(2)(A)

12  the sentence should reflect the seriousness of the offense.

13          Mr. Vodnoy has spoken with respect to Shane

14  Williams and I'm not going to, of course, refer to those

15  things which have been stricken by the Court, but I do want

16  to talk about Shane Williams in two aspects that I think

17  everyone here would agree with.  And those two things are

18  this:  First of all, Mr. Williams' life cannot be

19  characterized any different than to say, up to this point at

20  least, it has been hell.  The other thing that you can say

21  about Shane Williams is that for much of his life Shane

22  Williams was a PCP addict.

23          When he came here you had -- the Court looked at

24  him with respect to his children, his girlfriend, the effects

25  of his past on his family and, of course, looking at him.

1    You look at Shane Williams, as he testified, he is certainly

2    intelligent.  He seems quite hard working, but his life has

3    been terrible and he has been a PCP addict.

4         The Court I know has seen many drug cases.  It is

5    hard to take various types of drugs, cocaine, speed, PCP, and

6    say which one is more destructive than the other, but I think

7    it is fair to say that PCP does have a particular physical

8    destructiveness on the nervous system and on the brain.

9         The Court is aware that usual dosages of PCP, you

10    take a cigarette, you dip it into the stuff, and then you

11    smoke it.  And the smaller cases you've seen it is usually

12    vanilla extract bottles at which the person is selling from

13    time to time.

14         If you took the amount of PCP consumed by Shane

15    Williams in his entire life it would be a fraction of what

16    was distributed by the defendant in this case.

17         At the beginning of the case we heard from Donald

18    Hunter and the purchase of the half gallon of PCP in this

19    case out in the parking lot of the Food 4 Less and Taco

20    Bell.  There was a lot of questions both by myself and

21    Mr. Vodnoy and the other attorneys with respect to the fact

22    that Mr. Hunter would put in a lot of calls to Mr. Reed and

23    Mr. Reed wouldn't call him back.  That happened many, many

24    times.  And Mr. Hunter explained why that was the case.  He

25    said, well, I'm only buying a half gallon.  That's nothing to

1    Mr. Reed and that's why he's not calling me back.  But in his
2    lifetime Shane Williams dipping those cigarettes isn't going
3    to use a half gallon.

4            The conclusion you've got to draw from those
5    175 gallons that were found by the jury in this case is that
6    there are probably a lot of Shane Williamses out there in the
7    world, people who are addicts, with the defendant, in fact,
8    feeding that addiction.

9            Now, all drug use is to some degree a voluntary act
10    by the person consuming the drugs.  You can debate the pluses
11    and minuses of that, to what extent it is and it is not, but
12    you saw Shane Williams.  Pretty smart guy.  He's a hard
13    working guy, gets out and wants to get his contractor's
14    license.  He said when he testified, I never wanted to have
15    that PCP near me because if it was near me I knew I would use
16    it.  That's one example.

17            And then, of course, you have the repercussive
18    effects of 175 gallons out there.  Addicts steel, they rob,
19    they commit burglaries, there may be prostitution involved,
20    violent acts, all of that reverberates out there based on
21    those 175 gallons in this case.

22            But I don't mean to say that you have to engage in
23    this sort of abstract calculation as to who these other
24    people are out there who have been effected by it.  Your
25    Honor, of course, has seen it in this case just about every

1   Monday morning for the last two years.  Just to look at the

2   face of the Indictment in this case you can see what effects

3   that PCP has had on the community.

4           Go through some of the names.  Way back when, Craig

5   Smith.  He stood up here.  Back there was his girlfriend.  He

6   is the guy who had the light freckles on his face.  Back

7   there in the back was his girlfriend wearing a white coat.

8   Mr. Smith -- you got a sense that it was his girlfriend who

9   was working very hard to keep him on track, and she wasn't

10  able to do that.  When she was off at work he made some

11  contact with Mr. Reed and sold quantities of PCP.

12  Mr. Smith's girlfriend has leukemia.  She's going in and out

13  of treatment.  And that's the situation they are in now.  I

14  don't mean to say that Mr. Smith didn't engage in voluntary

15  activity but, of course, Mr. Reed was there with the

16  opportunity to sell that PCP.

17          Then let's look at some of those other people.

18  Norman Gray stood here before Your Honor.  Your Honor had a

19  little bit of difficulty taking the plea and doing the

20  sentencing with regard to Mr. Gray because Mr. Gray has had

21  multiple strokes and has a birth defect in his carotid

22  artery.  Mr. Gray is ambulatory but he is not in good

23  physical condition.  He sold quantities of PCP that were

24  provided by Mr. Reed.  He is now off doing approximately

25  four years in prison.  Voluntary act by Mr. Gray but, of

1    course, it is the defendant who supplied that PCP.

2        Then you look at some of the other individuals, and

3    I won't go through all of them.  The Court remembers I'm sure

4    the sentencing of Traniel Brooks.  Even before Ms. Brooks

5    stood before -- even before Ms. Brooks met the defendant, her

6    life had been extremely unfortunate.  Then the defendant

7    comes into her life and it certainly doesn't get any better

8    after that point.

9        Then look at Ms. Knox.  If you take -- and we're

10   apart from the drugs, but if you take what Ms. Knox says that

11   she didn't know what silencers were or didn't know exactly

12   what was up there, what does that mean?  That means this

13   defendant has gone over to a person he doesn't know that

14   well, put these loaded -- those guns were loaded -- weapons

15   with silencers on them up above her refrigerator when she has

16   got a little kid there, and if you take what she says is

17   true, didn't tell her.  Didn't tell her exactly how much of a

18   risk she was exposing herself to.

19       Lastly, Harry Phillips.  Basically, Mr. Phillips

20   stood up here.  He seemed like basically a law-abiding

21   citizen and has been for quite a long period of time.  Maybe

22   ten years ago he had a traffic matter but that was about it.

23   He became very briefly involved when he helped Lee Johnson go

24   up to one of the labs in Palmdale.  Harry Phillips, good

25   musician, good member of the community, now has a felony

1    conviction.

2           You don't need to engage in all those abstractions

3    about how many people were damaged by this.  Your Honor has

4    seen them over and over again.  What 3553(a) says is it

5    should reflect the seriousness of the offense.  Those people

6    out there, they have either lost their lives in their

7    entirety or big chunks of their lives and the sentence should

8    reflect the seriousness of the offense.  A life sentence

9    recognizes that.

10          THE COURT:  Mr. Vodnoy, do you have anything to say

11   in response?

12          MR. VODNOY:  Just very briefly.  Shane Williams in

13   addition to being an addict is also someone who manufactured

14   drugs.  All of these people, nobody suggested that somebody

15   put a gun to their head to get involved, but it is easy for

16   someone else to say, well, it's not my fault, it's somebody

17   else's fault, and place it at the feet of Mr. Reed.  These

18   were adults that were making choices.  And the fact that they

19   made choices and wound up in your court, that is their fault,

20   their fault.  And to give Mr. Reed life because a bunch of

21   adults made choices that they voluntarily made I think would

22   be wrong.

23          I think Mr. Reed wants to address the Court.

24          THE COURT:  All right.  Mr. Reed, before I sentence

25   you, you have the right to speak.  You may join your attorney

1   at the lectern.

2        DEFENDANT REED:  Yes.  I just want to say, Your

3   Honor, a couple things.  First of all, Your Honor, I ain't

4   this monster who the Court, the agents and the Government is

5   making me out to be.  You know, I would like to start with

6   Shane Williams.  He's not no addict, drug addict, who he

7   testified to be.  He's a manufacturer.  If you check his

8   body, he's got chemical burns all over his body from

9   manufacturing PCP.

10        Norman Gray, he's a manufacturer.  You know, I

11  didn't have them doin' nothing.  They was doing things on

12  their own without me.

13        And another thing, they didn't like, not the

14  silencers, you know, I ain't the type of person that would

15  speak on other people or say things.  I listened to what was

16  going on about the silencers.  My cousin got on the stand and

17  testified that I brought the silencers to Knox' house, put

18  them -- I was too short so he stuffed them in the cabinet.

19  If you clearly listen to the tape with Knox -- with me and

20  Knox talking, I admit I had a little gun at Knox' house.

21  When I called her I asked her about my little one.  And she

22  said -- she stated I don't know the little one from the big

23  one.

24        And when she said that Kim Stinson -- she said I

25  asked her, no -- I asked her about -- no, let me see.  When

1    she said that Kim and her was the ones that took the guns to

2    her house at night, and I asked her, I said -- when she said

3    she don't know the little one from the big one and she

4    said -- that I asked her about Traniel knew the big one was

5    at your house and she said she know what me and Kim did that

6    night.  You know, he got up there and testified that I

7    brought them there.  I never even took those guns to her

8    house.  Her and Stinson took the guns there.  He lied about

9    me placing the guns up there.  That was all lies that they

10   told.

11          And then, of course, the PCP, in the beginning in

12   February Donald Hunter, you know, he was calling me but he

13   was around me.  He was building studios.  I was giving him

14   work to build studios.  And he kept asking me over and over.

15   And I wasn't even doing drugs at the time.  And Kim was his

16   best friend running with him.  And Stinson was living with me

17   at the time.  So Labbe hooked up with Stinson and Donald

18   Hunter and what they have been trying to hide to the Court is

19   Stinson, like he's a co-defendant when he really was an

20   informant.

21          He kept asking me, bugging me, you know, to sell

22   him the PCP, to get it for him, and I wouldn't indulge him.

23   I found -- he was at home.  Kim, if you listen to the calls,

24   the tape monitored calls, you can see how they set me up.

25   Kim would call -- Donald would call him at like 9:00 in the

1   morning and he said, "Where's Old Boy at?"  And he was

2   talking about me.

3           "He's not here."

4           "Oh, because my bride is here.  Man, she want to do

5   that thing."

6           When he said that, Kim said okay, let me call him

7   right now.  So when they hang up, 20 minutes go by.

8           Donald called back again and said, "Man, what's up?

9   She is getting tired of waiting."  And when he said that Kim

10  said, "He was going to call you."  All the time this is

11  taking place, Your Honor, they are trying to make it look

12  like I wasn't there.  I was in the house with Kim all the

13  time this was taking place.

14          So the next call should be coming from me calling

15  Donald if I said I'm going to call him, but the next call is

16  not coming from me, it's coming from Kim Stinson.  He called

17  Donald back and say, "Oh, look, man, here's his number.  He

18  wants you to call him right now."  So when he hung the phone

19  up, Kim came right in the room with me -- I was at home all

20  the time with Kim -- and hand me the phone and said,

21  "Donald's supposed to call you, man.  He's been trying to get

22  with you all day.  He's bugging me."  So all the time this is

23  the way they set it up to entrap me.  Kim is not a

24  co-defendant like they have been pretending him to be, Your

25  Honor.

1           And then how I really found out, after I admit to

2    making the sale and we did it, he got mad at Anthony Piggue

3    one day.  And he said, "Trust me, niggah, you and my cousin

4    both going to the feds."  And so Piggue called me and he said

5    man, "What's up with that, man?"  I didn't pay no attention

6    at the time.

7           So then Kim was still living with me.  Then July

8    came around and it was July 4th.  I always give a family

9    reunion and fireworks for the kids and neighbors and stuff.

10   So after the fireworks was done Kim told -- he called his

11   girlfriend named Robin who was living out there in Rialto.

12   She wasn't at home so he left a message with her mother.  He

13   said it is an emergency.  Please give her this message.  Do

14   not come to my residence and to my cousin Richard's and Terry

15   Jackson's residence.  It is an emergency.

16           So after the 4th -- he stayed with me for two

17   years.  He left that night.  He never came back home.

18   July 10th my doors got kicked down.  And after that Robin

19   came by like on the 13th and she said she was worried about

20   us.  And I asked her why and my cousin Richard asked her why.

21   She said because Kim left a message for me not to come to

22   your residence, it's an emergency.  So I knew then what was

23   going on.  I knew he had set me up and was working with

24   Labbe.  And after that I didn't see him no more.

25           So we get picked up October 27th.  That's the last

1    time I seen Kim.  And when I seen him we was all at the

2    holding tank.  He was released and in the room eating pizza

3    with the agents, with Labbe and Michelle Starkey and they're

4    eating pizza with the agents.  And I never seen him again.

5             And this is how I end up in solitary.  When I

6    finally get to San Bernardino, I asked my sister to contact

7    him to see if she can find him and tell him that I love him

8    and I forgive him, just come to court and tell the truth that

9    he was an informant working for Labbe.  And Agent Starkey,

10   they took that conversation and twisted it that I was

11   threatening people and I was going to kill him.  And all I

12   said was find him and tell him I love him and I forgive him.

13   And they took that and got me put away for two years in

14   solitary where I remain today.

15            You know, I admit to my actions, Your Honor, but a

16   lot of this stuff, you know, I've been quiet and watching it

17   go on, you know.  And they've been hiding the fact like he's

18   a co-defendant when he really was an informant.

19            And Shane Williams is a manufacturer.  He get up on

20   the stand and he lied.  He buried that PCP.  When I seen him

21   when I was down -- when they brought me down to fingerprint

22   me, they set me up.  They had him down there waiting for me,

23   you know, okay?  But he had said some things to me, you know,

24   start calling me, your crew and all your snitches, how did

25   they find my stuff I buried.  And I was like, you know, it is

1   like how they come here and they get on the stand and they

2   just lie.  And they make me out to be this monster that I'm

3   not.

4           You know, if you listen to the tapes good, you can

5   see on the silencers that I was never there.  Kim Stinson and

6   Natalia Knox had took the guns to her house.  When I asked

7   her about my little one, she said I don't know the big one

8   from the little one and I said she know the big one is over

9   there.  Because I knew they were there.  Kim told me they was

10  there.  That's when she said what does she know that me and

11  Kim did that night, stating that they took the guns there.

12          MR. VODNOY:  May I have a moment, Your Honor?

13          THE COURT:  Certainly.

14          (Counsel and the defendant confer)

15          THE COURT:  I'm sorry, Mr. Reed.  Anything else?

16          DEFENDANT REED:  Your Honor, they just make me out

17  to be this monster where I've been placed for two years.  I

18  mean it's been hard for me, you know.  I've got high blood

19  pressure now just from suffering, was not able to see my kids

20  for 18 months, the conversations being twisted from the agent

21  by me telling someone that I love them and I forgive them and

22  tell the truth.  They twisted it to the Court and got me put

23  away for two years where I remain today.

24          And if I deserve a life sentence -- in a lot of

25  these conversations that they got in the motion is not saying

 1   what they got, the way they put them.  That's why they don't

 2   have a call number by them.  A lot of those conversations

 3   they just making them up to be something they're not.

 4        You know, my kids, I love my kids, too, you know.

 5   I would like if you would give me a chance to reunite with my

 6   kids one day, but -- and like Stinson and a lot of them

 7   people that testified, they was really informants and they

 8   have been hiding this all the time.  I have been looking at

 9   it.  You know, I took him in to help him all the time, you

10   know.  He hooked up with them and set me up.  But I bit into

11   it and here I am.

12        THE COURT:  Is there anything else that you would

13   like to say, Mr. Reed?

14        DEFENDANT REED:  That's it.  That's it, Your

15   Honor.

16        THE COURT:  You may stay at the lectern, please.

17        Is there any legal cause why judgment should not

18   now be imposed?

19        MR. VODNOY:  No, Your Honor.

20        THE COURT:  The Court has considered the sentencing

21   factors set forth at 18 United States Code, Section 3553(a).

22   It has also considered the advisory guideline sentencing

23   range of life imprisonment based on the offense level of 44

24   and criminal history category of 2.  It hereby imposes

25   sentence as follows:  It is ordered that the defendant shall

1    pay to the United States a special assessment of $400 due

2    immediately.

3            And pursuant to the Sentencing Reform Act of 1984,

4    it's the judgment of the Court that the defendant, Rodrick

5    Cardale Reed, is hereby committed on Counts 1, 2, 3 and 4 of

6    the First Superseding Indictment to the custody of the Bureau

7    of Prisons to be imprisoned for a term of life.  This term

8    consists of a life sentence on each of Counts 1, 2, 3 and 4

9    of the First Superseding Indictment to be served

10   concurrently.

11           In the event that the defendant is released from

12   imprisonment, he shall be placed on supervised release for a

13   term of 5 years on each of Counts 1, 2 and 3 and 3 years on

14   Count 4 of the First Superseding Indictment, such terms to

15   run concurrently under the following terms and conditions:

16           He shall comply with the rules and regulations of

17   the U.S. Probation Office and General Order 318.

18           He shall pay the special assessment in accordance

19   with this judgement's orders pertaining to such payment.

20           He shall refrain from any unlawful use of a

21   controlled substance and submit to one drug test within

22   15 days of release from imprisonment and at least two

23   periodic drug tests thereafter not to exceed eight tests per

24   month as directed by probation.

25           He shall participate in outpatient substance abuse

1  treatment and submit to drug and alcohol testing as

2  instructed by probation and abstain from using illicit drugs,

3  abusing alcohol and prescription medications during the

4  period of supervision.

5         And during the course of supervision the probation

6  office, with the agreement of defendant and defense counsel,

7  may place the defendant in a residential drug treatment

8  program approved by the probation office, and that may

9  include counseling and testing.  And if so, then he shall

10  live in the treatment program until he is discharged by the

11  program director and the probation office.

12         As directed by probation he shall pay all or part

13  of the cost of treating any drug addiction.  And he shall

14  provide payment and proof of payment as directed by

15  probation.  And he shall cooperate in a collection of a DNA

16  sample.

17         Is there a request for placement in Southern

18  California?

19         MR. VODNOY:  Yes, Your Honor.

20         THE COURT:  That will be the recommendation to the

21  Bureau of Prisons.

22         Mr. Reed, you have the right to appeal your

23  conviction and your sentence.  And once your notice of appeal

24  is prepared you may ask the clerk of court to file it for

25  you.  You may also ask that you be allowed to file it without

1 paying the usual required fees.  And with very few

2 exceptions, any notice of appeal has to be filed within

3 10 days from today's date.

4   Do you understand your appeal rights?

5   MR. VODNOY:  Your Honor, I have prepared a notice

6 of appeal.  The only thing -- and I'm Court-appointed as you

7 know and he has no money -- can I turn that in to your clerk

8 even though we don't have a copy of the judgment order?

9   THE COURT:  That has to be filed downstairs.

10   MR. VODNOY:  Filed downstairs.  Can I file it

11 without the judgment order?

12   THE COURT:  That you'll have to check with the

13 clerk downstairs, but I think it can be filed as of today

14 because the judgment and commitment order will issue today,

15 today or tomorrow.

16   Is the underlying Indictment to be dismissed?

17   MR. SEARIGHT:  Yes, with regard to this defendant.

18   THE COURT:  It is so ordered.

19   MR. VODNOY:  Thank you, Your Honor.

20   THE COURT:  All right.  Thank you very much.

21   The defendant is remanded to the custody of the

22 United States Marshals.

23     (Proceedings concluded)

24      ---oOo---

25

C E R T I F I C A T E

DOCKET NO. EDCR 03-84(A) VAP

I hereby certify that pursuant to Section 753,
Title 28, United States Code, the foregoing is a true and
accurate transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the regulations
of the Judicial Conference of the United States.


PHYLLIS A. PRESTON, CSR          DATED:   June 26, 2006
Official U.S. Court Reporter
License No. 8701