TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
TIMOTHY J. SEARIGHT (SBN 151387)
Assistant United States Attorney
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3749
     Facsimile: (213) 894-0142
     E-mail: Timothy.Searight@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR 03-0084-VAP |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S APPLICATION FOR COMPASSIONATE RELEASE; MEMORANADUM OF POINTS AND AUTHORITIES IN OPPOSITION |
| v. | |
| RODRICK CARDALE REED, | |
| Defendant. | |

The government, by and through an attorney of record, Assistant United States Attorney Timothy J. Searight, hereby files opposition to defendant Rodrick Reed's motion for compassionate release. The government's opposition is based on the attached memorandum of

///

///

///

///

///

///

///

points and authorities and compendium of documents filed concurrently with this opposition.

                                                 Respectfully submitted,

                                                 TRACY L. WILKISON
                                                 Acting United States Attorney

                                                 SCOTT M. GARRINGER
                                                 Assistant United States Attorney
                                                 Chief, Criminal Division

Dated:   June 22, 2021                 /s/
                                               TIMOTHY J. SEARIGHT
                                               Assistant United States Attorney

                                               Attorneys for Plaintiff
                                               UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**STATEMENT OF FACTS**

On October 30, 2003, defendant was arrested and arraigned on an Indictment. (CR 103.) In a superseding indictment filed before trial, defendant was named in four counts. In Count One, defendant and several others were charged with conspiracy to manufacture, possess with intent to distribute, and distribute phencyclidine ("PCP"), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). (Id.) Count Two charged defendant with possession with intent to distribute PCP. Count Three charged defendant with manufacturing of PCP. In Count Four, defendant was charged with conspiracy to possess firearm silencers, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 5861. (Id.)

On July 7, 2005, the government filed an information alleging that defendant had previously been convicted of a felony drug crime. (CR 928.) Specifically, the government alleged that, on October 25, 1990, defendant was convicted of possession of cocaine with intent to distribute, in violation of California Health and Safety Code Section 11351 (ER 1-2.)[1]

---

[1] "ER" refers to the government Excerpt of Record filed concurrently with this document, and the citation is followed by the page number. The Pre-Sentence Report ("PSR") is referenced extensively in this document and can be found at page six of the ER. The government has not filed it under seal because it was attached to defendant's motion on the record. The PSR citations are followed by the paragraph number within the PSR. "RT" refers to Reporter's Transcript of proceedings that have previously been filed with this Court and the citation is followed by the date and page number.

1

### A. Trial Proceedings

On July 12, 2005, defendant proceeded to jury trial with three co-defendants. (CR 954.)

At trial, agents and officers from a Los Angeles task force testified that in the fall of 2002, they began investigating PCP manufacturing and distribution activities of Reed and his associates. (RT 7/15/05 125.) On February 20, 2003, a law enforcement informant purchased a half-gallon of PCP from an associate of Reed's in a grocery store parking lot in Los Angeles. (RT 7/13/05 100, 116-18).

On March 21, 2003, in an isolated area near Adelanto, California, agents located a PCP manufacturing site, recovered four pounds of PCP, and chemicals and equipment used in the manufacture of PCP. (RT 7/15/05 28, 32-34, 93-97.) Based on the controlled purchase of PCP and the seizure in Adelanto, and other information, agents obtained a series of orders to conduct wiretap interception of telephones being used by Reed and his associates. They began intercepting telephones on April 4, 2003, and continued through early June 2003. (RT 7/15/05 107-13.)

On April 13, 2003, the wiretap intercepts led to the stop of a van traveling on interstate 15 north of San Bernardino. The van was found to contain 26.1 kilograms of PCP in crystalline form and chemicals and equipment capable of producing approximately 175 kilograms of PCP. (RT 7/22/05 51-61, 103-05.) On April 18, 2003, defendant was heard speaking to an associate and telling him that the chemicals were capable of making 150 gallons of PCP. (RT 7/21/05 57).

A few weeks after the seizure on Interstate 15, in May 2003, intercepted calls led to the seizure of five gallons of liquid PCP and the remnants of a PCP manufacturing operation at a property in Palmdale, California. (RT 7/22/05 7-13.) On May 14, 2003, agents intercepted co-defendant Shane Williams leaving a voice mail message on defendant's phone which stated, "This is Shane, man. I'm up here waiting on you. Hey, I went and checked it. They all set, but five sets is blank. I got three that had too much cyc in it but it's still set." (RT 7/21/05 125-26.)[2]

In addition to calls involving PCP production, calls were intercepted indicating that defendant was in possession of guns with firearm silencers. On June 14, 2003, defendant was intercepted speaking with a co-defendant about obtaining two firearms equipped with silencers stored in an apartment in which defendant's girlfriend was occasionally staying. (RT 7/20/05 112.) Defendant was intercepted telling the person, "I'll put a call on [her] right now, right? Have her to go get them. Go get these two things, right? These two quiet things that I'm having her bring." (Id.)

At the conclusion of the government's case, defendant and co-defendants moved to dismiss the case arguing insufficiency of the evidence. (CR 984.) The motion was denied. (Id.)

On July 28, 2005, defendant was convicted of each of the four counts alleged against him. The jury made a specific finding that the amount of PCP for which he was criminally responsible as a part of the conspiracy was 175 kilograms. (RT 7/28/05 10-15; PSR ¶ 118.)

---

[2] "Cyc" was interpreted by a government expert to refer to cyclohexanol, a precursor chemical in the manufacture of PCP. (PSR ¶ 92.)

3

**B. Defendant's Criminal History**

In preparation for sentencing, a Pre-Sentence Report was prepared. Defendant was born on December 26, 1968. (PSR ¶ 148.)

On November 14, 1990, when defendant was 21-years-old, he was convicted of a violation of California Health and Safety ("H&S") Code Section 11351 (possession of cocaine for sale). (PSR ¶ 134.) The PSR does not contain underlying facts about the conviction. Defendant initially received a sentence of 150 days in county jail. (Id.)

On February 21, 1996, defendant was arrested on a possession of drugs for sale charge in violation of California H&S § 11351. (PSR § 141.) On July 5, 1996, the charges were dismissed, but defendant's probation on the earlier drug case was violated and he was sent to prison for two years. (PSR ¶ 134.) Defendant was paroled on May 22, 1997. (PSR ¶ 136.) He was returned to prison on March 27, 1998. (PSR ¶ 136.) The PSR does not indicate what caused the return to prison. Defendant was paroled again on June 9, 1998, and discharged from parole in November 2000. (PSR ¶¶ 135, 136.)

As stated above, the facts of this federal case involving PCP manufacture and distribution arose in 2002 and the first part of 2003, when defendant was in his mid-30s.

///
///
///
///
///
///

4

**C.  Mandatory Minimum, PSR Calculations, and the Sentencing Hearing**

After trial and prior to the sentencing hearing, defendant admitted the allegation of prior felony drug conviction pursuant to 21 U.S.C. § 851 and 841(b)(1)(A). (CR 1132.) With the offenses of conviction in Counts One through Three, this resulted a mandatory minimum sentence of 20 years in prison on each of these three counts to be concurrently served. 21 U.S.C. § 841(b)(1)(A).

The PSR noted that, given the drug quantity of 175 kilograms of PCP for which defendant was found criminally responsible, the Sentencing Guidelines base offense level was 38. (PSR ¶ 118.)

The PSR viewed defendant as an "organizer or leader" of the PCP conspiracy group and that involved five or more participants. (PSR ¶ 121.) As a result, four Guidelines offense levels were added pursuant to Guidelines § 3B1.1(a).

In addition, the PSR added two offense levels pursuant to Guidelines § 2D.1.1(b)(1) for possession of the guns with silencers in conjunction with the drug crimes. (PSR ¶ 119.) Referencing the Guidelines application note for applying the enhancement, the PSR stated that it was not "clearly improbable that the weapon was connected with the offense." (Id.)

These provisions resulted in an adjusted Guidelines offense level of 44. (PSR ¶ 126.) The Criminal History category was II based on the prior felony drug conviction described above. (PSR ¶¶ 134, 138.)

The PSR noted that the cap for the Guidelines sentencing table was 43. (PSR ¶ 123.) Defendant's Guidelines sentencing range was life in prison with no lower range. (PSR ¶ 172.)

In defendant's sentencing position he argued that the government had engaged in "sentencing entrapment" or manipulation, that is, that the government had purposefully delayed the arrest of defendant in order to tie a greater amount of drugs to him.[3]

The government requested a sentence of life in prison for defendant. (ER 77.) The government reviewed the dangerous nature of the drugs, precursor chemicals and manufacturing equipment seized. The government recounted several wiretap intercept calls -- some of which were played at trial -- showing threats by defendant, and the seizure of the the two "loaded large-framed handguns" with attached silencers, and a separate seizure of an AK 47 firearm. (Id.)

With respect to the guns with attached silencers, in addition to the fact that he was convicted for possession of the silencers, the government recounted that there was a wiretap call in which defendant said he was going to pick-up "the quiet ones." (Id..) As to the AK-47 weapon, there was a wiretap call in which defendant asked an associate, "Where my AK at? It's in your storage or empty storage." (Id.) Agents later recovered an AK-47 magazine from a storage facility. (Id.) The government stated in the sentencing position that firearm silencers are because their only purpose is for the killing of a human being. (Id.)

---

[3] The government has been unable to locate defendant's sentencing position papers filed 15 years ago. The papers are not electronically stored in the PACER system. The government has located its own sentencing position. (ER 72.) In that document, the government quoted and cited to defendant's sentencing position.

6

In the government's sentencing position, it also presented several intercepted telephone calls in which defendant could be heard making threats to kill persons, sometimes because he believed they were cooperating with law enforcement. (ER 78-79.) The government set-forth several calls:

- On May 9, 2003, in an argument with a girlfriend, defendant said, "I can't wait to see you because I'm going to shoot you in your mother fuckin' mouth." Later that day, he called an associate and said, "She is going through my stuff. I'm going to have to kill her."

- On May 10, 2003, defendant referred to Donald Hunter, known as "Don Juan." Defendant said, "Fuck Don Juan, all these niggers, 'cause they bitches." Defendant said they were "fake ass niggers and I want them gone."

- On May 13, 2003, defendant said to an associate, "If anyone sees Melancon with the Mexicans, they should get their pistol out and get at him."

- On May 16, 2003, defendant was intercepted telling an associate that "Chico" had been released from prison. Defendant said, "We are going to hit hard, so get the little dudes out of there. You just nail the burn and we gonna handle this shit."

- On May 17, 2003, defendant was intercepted stating, "One more thing comes out of Ben's mouth, it'll be 'Pop Goes the Weasel.'"

(Id. 78-79.)

The sentencing hearing was conducted on January 17, 2006. (CR

1189.)  There were no objections to the PSR.  (ER 40.)  The Court adopted the calculations in the PSR as to defendant's offense level, Criminal History category and advisory Guidelines range.  (ER 40-41.) The majority of the Court's analysis was as to the § 3553(a) factors. As to the seriousness of the offense, the Court stated,

> [T]he amount of drugs involved in this case is many, many times the amount that would merit a life sentence under the Guidelines.  So it is hard to think of a sentence that would better meet that factor in terms of seriousness [ . . . ]
>
> [T]he violence of the defendant is shown, as I said a moment ago by the silencers in this case, the threats that were captured on the wiretap conversation, and of course, the dangerous nature of the drug that was being manufactured, the dangerous nature of the manufacturing process and the dangerous nature of the drug as it consumed by others.

(ER 41-42.)  A primary focus for the Court was the impact that the drug conspiracy and PCP produced had on other persons, including co-defendants in the case who were at lower levels of the conspiracy. (ER 43-44.)

Defendant argued that calls were misinterpreted, and did not reflect violence, and that no actual violence had been carried out. (ER 46-47.)

The Court imposed concurrent life sentences for each of the three drug counts of conviction, and a 5-year concurrent sentence for possession of the silencers.[4]  (CR 1189.)

Defendant's prison records do not show any substantial violations.  (ER 84.)

Defendant is currently 52-years-old.

---

[4] Five years is the maximum sentence for an 18 U.S.C. § 371 conspiracy.  Defendant was charged with a conspiracy to possess firearm silencers under 18 U.S.C. § 371 and 26 U.S.C. § 5861.

8

## II.

## ARGUMENT

Defendant's argument for re-sentencing is that he has been rehabilitated. Although he has contracted COVID-19, he does not argue that, for him, it is unusually debilitating. Defendant asks to be released not now – but in approximately three years – because he says he has learned from his custodial sentence, and is ready to be a constructive member in our communities.

These are not "extraordinary and compelling" reasons for release. In 2006, this Court made specific findings that the drug conspiracy that defendant led, the firearm silencers and guns he possessed, with threats he made about others and that were recorded in calls, showed that defendant was a danger to the public, and that a life sentence was warranted. That is a decision that was meant to endure.

It is meritorious that defendant has remained free of prison violations, has worked to stay a part of his family, and helped others, but these facts do not negate the serious crimes defendant committed and the harm he caused to others. There are other purposes of sentencing beside rehabilitation. While the government takes defendant's efforts at reform seriously, they are not "extraordinary and compelling" reasons for his prospective release in light of the damage he has caused, and the on-going risks his past presents.

Defendant's motion should be denied.

**A. Legal Authorities**

As a result of the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1)(A) states that "the court . . . upon motion of the

defendant . . . may reduce the term of imprisonment . . . after considering the factors in section 3553(a) to the extent they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction." At a later point, the section states that the reduction be "consistent with applicable policy statements issued by the Sentencing Commission."

The FSA, at 28 U.S.C. §§ 994(a) and 994(t), directed the Sentencing Commission to promulgate and adopt policy statements defining the meaning of "extraordinary and compelling reasons" for reduction. As noted by the Ninth Circuit in United States v. Aruda, 993 F.3d 797 (2021), the Sentencing Commission has not yet adopted such a policy statement.[5] Section 994(t), however, states, "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." The defendant seeking release under § 3581(c)(1) bears the burden to establish the statutory requirements. See United States v. Ortiz, No. 18-CR-2063-BAS, 2020 WL 5500229, at *1 (S.D. Cal. Sept. 11, 2020); United States v. Rogers, No. 16-CR-72-DAD, 2020 WL 5440352, at *3 (E.D. Cal. Sept. 10, 2020); United States v. McGrue, No. 08-CR-1318-ODW-1, 2020 WL 4042777, at *1 (C.D. Cal. Jul. 10, 2020.

---

[5] Prior to the FSA, in Guidelines § 1B1.13, the Commission has defined what circumstances are "extraordinary and compelling" for purposes of compassionate release. Specifically, application note 1 of this Guideline provides an exhaustive list of "extraordinary and compelling" reasons for release: (1) a debilitating or terminal medical condition; (2) a serious deterioration in health due to aging; (3) responsibility as the sole remaining caregiver to a minor child, spouse, or partner; and (4) other reasons as determined by the BOP.[5] U.S.S.G. § 1B1.13, cmt. n.1(A)-(D).

A defendant's motion must satisfy three requirements. First, the defendant has to establish "extraordinary and compelling reasons" for his release. 18 U.S.C. § 3582(c)(1)(A)(i). Second, the defendant must establish that he "is not a danger to the safety of any other person or to the community." 18 U.S.C. § 3582(c)(1)(A); see also United States v. Clews, 2020 WL 3529870 (June 30, 2020)(affirming denial of compassionate release motion because the district court reasonably concluded that the defendant was a danger to the community); United States v. Arceneaux, (same). And, third, the defendant has to establish that his release would be consistent with "the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A); see also United States v. Thrift, 834 F. App'x 411 (affirming denial of relief because the district court reasonably concluded that compassionate release would be inconsistent with the § 3553(a) factors); United States v. Mortensen, 2020 WL 2549970 (same).[6]

**B. The Previous Wiretap Calls Containing Threats Against Others in Conjunction with the Seizure of the Silencers and Firearms Show That Defendant is A Danger to the Community**

Whether viewed under the "danger to the safety of the community" language of § 3582(c) or as a § 3553(a) factor, defendant must show that he is no longer a danger to the community. Defendant repeatedly states that he was convicted of non-violent offenses. (Def. Mot., p. 14, 16.) Yet, at the same time he candidly states, "His offenses were severe and dangerous." (Def. Mot., p. 15.)

---

[6] The government does not dispute that defendant has exhausted administrative remedies.

11

With regard to the PCP manufacturing, the government described in its sentencing position the extraordinary dangers defendant created. (ER 79.) At the site of the Adelanto seizure, there was a building that was burned from a chemical fire. (Id.) More pointedly, with respect to the van stopped on Interstate 15 and laden with PCP and chemicals, an expert witness at trial testified that it was the largest PCP chemical seizure she had ever known. (Id.) She stated that the ether and chemicals inside the van had the potential to be "a moving fireball" on Interstate 15. (Id.) The Court, in imposing a life sentence, focused on the profound damage the PCP produced by defendant had on the lives of others, including co-defendants in the case. (ER 43-44.) The government argued, the PSR found, and the Court agreed, that defendant was "the leader of this conspiracy." (ER 44.) In his motion, defendant does not dispute any of these conclusions.

The focus of the government's argument for a life sentence was defendant's dangerousness as shown by his possession of the large-framed Intratec 9mm guns with attached silencers in conjunction with wiretap recorded threats and urging of violence. As the government stated repeatedly, there is no lawful purpose for possession of firearm silencers. Their purpose is to make it possible to quietly kill another human being. As to himself, defendant was recorded saying, "One more thing comes out of Ben's mouth, it'll be 'Pop Goes the Weasel'." (ER 78.) As to others, defendant was recorded telling an associate, "If anyone sees Melancon with the Mexicans they should get their pistol out and get at him." (ER 79.)

In his motion, defendant argues, "But he did not kill anyone. He did not assault anyone. He did not kidnap anyone." (Def. Mot., p. 15.) This is the same argument defendant advanced at his sentencing. Defendant argued at sentencing, "Nobody got killed. Nobody got shot, you know, and if half of this is the quantity and half of this is violence, there is no violence."[7] (ER 50.)

But in understanding defendant's intentions, propensities and dangerousness the fact that he obtained the silencers and they were attached to guns tells much. The several threats revealed in the wiretap calls only make defendant's frame of mind more clear. With regard to danger to the community, the Court made specific findings:

> The need to protect the public from further crimes of the defendant, the violence of the defendant is shown, as I said a moment ago, by the silencers in this case, the threats that were captured on the wiretap conversation, and of course, the dangerous nature of drug that was being manufactured, the dangerous nature of the manufacturing process and the dangerous nature of the drug as it is consumed by others. All of that shows the importance of that factor.

(ER 43.)

In this case, the Court was not bound by a mandatory minimum in imposing a life sentence. The government recommended a life sentence based on an evaluation of the Sentencing Guidelines and the § 3553(a) factors, and with an understanding of the impact this would have on

---

[7] Defendant references two cases from the Central District of California – of dubious citable authority – that he says have analogous facts to his case. They are United States v. Seresi, CR 89-0190-SVW and United States v. Brim, CR 93-098-DDP. The facts of the cases are difficult to access, but in Seresi the defendant was 70-years-old, and appears not have been a high level member of the conspiracy. In Brim, the facts are unclear, but defendant's mother was seriously ill with no family members to attend her. In neither case do the facts suggest the defendants had the types of weapons and made the kind of threats attributable to defendant and found by the Court in this case.

13

defendant and his future. It was, and is, an appropriate sentence based primarily on danger to the public.

In his motion, defendant stated that "[h]e also agrees that, at the sentencing hearing, "the Court found that Mr. Reed was a dangerous man and that society was best served by his life-long incarceration." That was the finding of the Court and, in imposing a life sentence, it was one that was meant to endure.

### C. Rehabilitation of Defendant Is Insufficient to Support Compassionate Release

Defendant's argument at heart is that he is now rehabilitated. He does not dispute that his crimes were dangerous, nor the Court's reasons for imposing a life sentence with merit. Defendant argues, "Mr. Reed is not the person that, at the time of his sentencing hearing, he was defined to be, and has proven to be a model inmate." (Def. Mot., p. 7.) Defendant also did states that he contracted COVID-19. As to his current status, he said he has yet to regain his sense of smell and is winded when he exercises. (Def. Mot., p. 13.) He statements about COVID and his health are not lengthy.

The thrust of his argument defendant's argument is that he has changed. Defendant has offered information from four inmates –- Gerald Jarrett, Alephious Rooks, Chris Turner and Gerald Smith –- that defendant has been a positive presence in counseling them, that he has encouraged them to stay out of trouble, pursue sobriety, gain vocational skills and "think beyond the gang mentality." (Def. Mot., pp. 8-9.) The government takes all of these to be true, and of real merit. As to himself, defendant relates a BOP progress report and assessment that he "is considered a model inmate at USP Atwater."

14

(Def. Mot., p. 7.)  In his family, defendant states that he has strived to remain a presence, despite his custody status, and continues to provide guidance to his three children.  (Def. Mot., p. 10-12.)  Family and associates have related that defendant has worked to resolve family problems, and that he would be welcomed back. Defendant has developed the outlines of a re-entry plan.  (Def. Mot., pp. 11, 12.)

Defendant, however, does not argue for his immediate release. Based on his rehabilitation, defendant asks this Court to modify his sentence to 300 months in prison, such that he would be released in approximately three years, in 2024.

The problem with defendant's argument is that compassionate release is not parole.  Defendant's efforts at rehabilitation, to help others in prison, and stay engaged with his family and friends, though meritorious, do not form "extraordinary and compelling" reasons permitting the alteration of his sentence.  Although defendant has contracted COVID-19, he appears to have largely recovered.  If he does not entirely agree with the Court's reasons for imposing a life sentence in 2006, he at least does not challenge that the Court's reasons were well-founded.  To this day, and after the FSA, the Guidelines advisory range for defendant's sentence remains life in prison.

What has changed, defendant argues, is himself.  But even under the FSA, rehabilitation is not alone a basis for re-sentencing or release.  It is to be expected -- or at least hoped -- that a defendant serving a sentence will learn from the crimes, and make

efforts to rehabilitate.  It is what would have been hoped for in 2006.

Sentencing has many purposes apart from rehabilitation, including deterrence, incapacitation and to "reflect the seriousness of the offense."  18 U.S.C. § 3553(a).  Defendant's rehabilitation -- taken as true -- is not an "extraordinary and compelling" circumstance warranting re-sentencing.

## III.

## CONCLUSION

Defendant's motion for re-sentencing should be denied.